## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

EARL NEWHOUSE,                          )        CASE NO. 1:17CV1276
                                        )
              Plaintiff,                )        JUDGE SARA LIOI
                                        )
       v.                               )        MAGISTRATE JUDGE
                                        )        JONATHAN D. GREENBERG
NANCY A. BERRYHILL,                     )
       Acting Commissioner              )
       of Social Security,              )
                                        )        **REPORT AND**
              Defendant.                )        **RECOMMENDATION**

Plaintiff, Earl Newhouse, ("Plaintiff" or "Newhouse"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his request to reopen a previous application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In April 2001, Newhouse, proceeding *pro se*, filed an application for DIB, alleging a

disability onset date of June 30, 1999.  (Transcript ("Tr.") 17, 21.)  On June 25, 2001, Newhouse

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

sent a letter to the Social Security Administration ("SSA"), in which he stated (in part) as

follows:

> Please withdraw my application for Social Security as I am extremely disappointed
> in a system that I paid into which holds my money & could put me through so much
> ridiculous red tape to get what is rightfully mine anyways.  I've paid taxes into the
> system and deserve better than what I've got. * * * You do not treat people like
> myself who is suffering from PTSD, Depression, and a back injury like [that].

(Tr. 24.)

Despite the above, on July 24, 2001, the SSA found Newhouse disabled as of June 30,

1999 due to affective disorder and anxiety.  (Tr. 17, 27, 162.)  This determination specified

Newhouse was eligible for Medicare benefits only, due to the fact he did not have sufficient

quarters of coverage[2] to qualify for DIB.  (Tr. 17, 27-28.)  It further explained as follows:

**Other Social Security Benefits**

The benefit described in this letter is the only one you can receive from Social
Security.  If you think that you might qualify for another kind of Social Security
benefit in the future, you will have to file another application,

**Do you Disagree with the Decision?**

If you disagree with this decision, you have the right to appeal.  We will review
your case and consider any new facts you have. A person who did not make the
first decision will decide your case.  We will correct any mistakes.  We will
review those parts of the decision which you believe are wrong and will look at
new facts you have.  We may also review those parts which you believe are
correct and may make them unfavorable or less favorable to you.

---

[2] According to the SSA, the term "quarter of coverage" or "QC" "is the basic unit for
determining whether a worker is insured under the Social Security program.  No matter
how high your earnings may be, you can not earn more than 4 QC's in one year."  *See*
https://www.ssa.gov/oact/cola/QC.html.  The legal definition of this term and the
requirements for earning quarters of coverage are set forth in 42 USC § 413(a)(2)(A).  In
sum, a claimant needs to earn a certain amount of earnings to earn one quarter of
coverage for purposes of DIB.  In the year 2000, this figure was $780.  *See*
https://www.ssa.gov/oact/cola/QC.html.

(Tr. 27.)  The determination noted Newhouse had sixty (60) days to appeal, and enclosed a pamphlet containing further information about the appeal process.  (*Id.*)  Newhouse, who was not represented by counsel at the time, did not timely appeal the decision.  (Tr. 17.)

Eleven years later, on September 10, 2012, Newhouse filed a new application for DIB, again alleging an onset date of June 30, 1999.  (Tr. 29-35.)  As part of this application, Newhouse provided earnings information showing additional self-employment income from the years 2000 and 2001.[3]  Based on this updated information, the SSA determined Newhouse now had sufficient quarters of coverage to be insured for DIB beginning January 1, 2001.  (Tr. 17, 37.)  However, the SSA found he could only be awarded DIB back to August 2011, twelve months prior to the filing of his September 2012 application.  (Tr. 17, 38-40.)

Newhouse, who was now represented by counsel, requested reconsideration, arguing he was "entitled to benefits further back in time."  (Tr. 17, 42.)  The SSA denied reconsideration, finding the regulations did not permit Newhouse to receive retroactive benefits more than 12 months prior to his September 2012 application.  (Tr. 17, 47.)  Newhouse requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 48.)

On May 16, 2015, a hearing was conducted before an ALJ, at which Newhouse (represented by counsel) testified.  (Tr. 178-196.)  Thereafter, on June 19, 2015, the ALJ issued a

---

[3] As discussed *infra*, the parties herein dispute whether the Agency was aware (or should have been aware) of this self-employment income at the time of Newhouse's 2001 application.  In his June 2015 decision, the ALJ determined the "Agency did not have any record of" Newhouse's updated self-employment income at the time of the 2001 application.  (Tr. 18.)  The ALJ further found "no evidence or compelling reason to believe that the claimant was misled or not given sufficient attention when the claim was taken," and "no evidence at the time of the application that there was any error on the part of the claims representative."  (*Id.*)

3

written decision, finding reopening of Newhouse's April 2001 application for disability benefits

was not appropriate.  (Tr. 15-20.)  The Appeals Council declined further review on April 28,

2017.  (Tr. 5-9.)

On June 19, 2017, Newhouse filed his Complaint in this Court to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.

(Doc. Nos. 13, 14, 15.)  Newhouse asserts the following assignment of error:

> The Administrative Law Judge's finding that Plaintiff's 2001 Disability
> Application should not be reopened failed to comply with relevant regulations and
> lacked the support of substantial evidence.

(Doc. No. 13.)

## II.    EVIDENCE

### A.    Disability Report

On May 24, 2001, Newhouse completed a Disability Report as part of his initial

application.  (Tr. 152-161.)  He indicated he completed the 12th grade and did not attend special

education classes.  (Tr. 159.)  When asked to identify the conditions that limited his ability to

work, Newhouse reported "back injury, overwhelmed with extreme stress, depression, anxiety &

anger, extreme chronic pain in lower and mid-right back & sciatic nerve damage, chronic pain in

back."  (Tr. 153.)  He noted he had been "extremely stressed, depressed, angry, anxiety to the

point of anxiety attacks, loss of drive and self esteem."  (*Id.*)

Newhouse stated he stopped working on December 23, 2000 due to "extreme chronic

back pain" and extreme stress.  (Tr. 153.)  He indicated that, as of that date, "emotionally I was

not stable to work a job, especially customer service," stating "just the slightest bit of stress or

problems sends me into panic anxiety." (*Id.*)  When asked to identify "the jobs that you have had

4

in the last 15 years that you worked," he identified the following positions:

| Job Title | Type of Business | Dates worked | Hours per day | Days per week | Rate of Pay |
|---|---|---|---|---|---|
| Desk Clerk | Hotel | 9/10/2000-12/23/2000 | 8 | 4-5 | $7.00/hour |
| Custodian | School | 3/18/97-6/30/99 | 5 | 5 | $11.05/hour |
| Shipping & Receiving | Electronics | 12/3/97-3/16/97 | 8 ½ | 5 | $8.50/hour |
| Test Tech | Car testing emissions | 11/93-11/94? (Don't know) | 8 ½ | 5 | $7.50/hour |
| Shuttle Driver | hotel/shuttle service | 9/94 | | | $5.50/hour |
| Auto Service Writer | Automotive Repair | 7/93 -10/93 | 9/5 | 5/1 | $8.50-9.00/hour |
| "self"– Parenting and housekeeper | Home | 4/81-1993 | 24 hours | 7 | no pay – love and family |

(Tr. 154.)  In addition, at some point during the application process, it appears Newhouse reported self-employment income in the cleaning industry for the year 2000.  (Tr. 17, 68.)  No specific amount earned is identified; rather, the form contained in the record states only that Newhouse earned over $400 net in self-employment income in the year 2000.  (Tr. 68.)

Newhouse identified Dr. Wendy Gajarski, "Dr. Lord," and Dana Trau as his mental health care providers; and Dr. Mike Mulcahy as his chiropractor.  (Tr. 155-156.)  He indicated he was currently taking Ativan, Paxil, and Celebrex.  (Tr. 158.)  In the "Remarks" section of the Report, Newhouse stated as follows:

> * * * I am so stressed out and overwhelmed with depression and anxiety to where just the slightest challenge or stress gives me panic anxiety attacks & hypertension.

5

I can no longer tolerate working with people or customer service.  I cannot get over the anger, confusion & disappointment from the abuse, harassment, discrimination, and job loss that I have endured. . . . During all this ridiculous bureaucratic red tape– they only make people sicker and suffer more.  Please help, as I can't get anyone else to.

(Tr. 160.)

## B.    Medical Evidence

On June 8, 2001, Newhouse's treating psychologist, Wendy Gajarsky, Psy.D., submitted a statement regarding his mental impairments.  (Tr. 139-142.)  Dr. Gajarsky indicated she had first examined Newhouse on June 11, 1999, and last examined him on June 5, 2001.  (Tr. 142.) She stated his current therapy included individual psychotherapy "about twice a month" and described his response to therapy as "relatively poor."  (Tr. 141.)  Dr. Gajarsky described Newhouse's mood as "extremely depressed, severe; highly anxious; extreme anger and rage." (Tr. 139.)  Dr. Gajarsky noted he "has a great deal of emotional lability as well as emotional withdraw[al] and social disengagement because of anger and depression."  (*Id.*)  With regard to Newhouse's thought content, she found he was "preoccupied with being mistreated and victimized from previous job situation," noting he felt "extreme anger and rage over this situation."  (*Id.*)

Dr. Gajarksy then described Newhouse's cognitive functioning as follows:

He appears to be of average intelligence.  There is an extreme disruption in ability to focus and concentrate.  There is disruption in recent memory.  There is also inability to follow through with daily functioning and simple tasks.

(*Id.*)  She later indicated Newhouse suffered from "extreme impairment in functioning and inability to follow through on tasks, and inability to sustain efforts required for daily tasks due to depression."  (Tr. 140.)  Dr. Gajarksy also found Newhouse's ability to relate to other people

6

(including fellow workers and supervisors) was "extremely poor," noting "there is a lack of trust," "great fear of being mistreated," and "fairly high" levels of suspicion.  (*Id.*)

Dr. Gajarky diagnosed major depression, severe; generalized anxiety disorder; and post-traumatic stress disorder.  (Tr. 140.)  She concluded as follows:

**Understand and follow directions**:

Capable of following and understanding instructions, however, there is high tension with authority.  Great deal of concern about his ability to measure up and be appropriately evaluated in his performance.

**Maintain attention required**:

There is very little ability to maintain attention.

**Withstand ordinary stress and pressures**:

There is almost no ability to withstand any kind of stress and pressure.  Stress highly exaggerates the depression, anxiety, as well as the anger.

\* \* \*

His understanding and memory is fairly limited. His concentration is extremely poor, and his ability to interact with others is poor, as well as his ability to adapt is also extremely poor.

(Tr. 141-142.)  Finally, she concluded Newhouse was "probably capable of managing benefits."[4] (Tr. 141.)

On June 28, 2001, state agency psychologist Karen Stailey, Ph.D., reviewed Newhouse's records and completed a Psychiatric Review Technique ("PRT").  (Tr. 125-138.)  Dr. Stailey found Newhouse met the requirements of Listing 12.04 (affective disorder) from his alleged

---

[4] It appears Dr. Gajarsky also submitted an undated, handwritten response to a questionnaire regarding Newhouse's mental impairments.  (Tr. 143-147.)  This response is largely identical to Dr. Gajarsky's statement, discussed above.  (*Id.*)

disability onset date to the date of the evaluation.  (Tr. 125.)  She found evidence of disturbance of mood, accompanied by full or partial manic or depressive syndrome, including anhedonia or pervasive loss of interest in almost all activities, psychomotor agitation or retardation, difficulty concentrating or thinking, and a "high level of suspicion."  (Tr. 128.)  Dr. Stailey also found evidence under Listing 12.06 (anxiety-related disorder) of generalized persistent anxiety and recurrent and instrusive recollections of a traumatic experience, which are a source of marked distress.  (Tr. 130.)

Dr. Stailey went on to find Newhouse had marked limitations in both maintaining social functioning and concentration, persistence, or pace.  (Tr. 135.)  In her notes, Dr. Stailey noted evidence of extreme anger and rage, extreme disruption in concentration and short term memory, and extreme problems with authority as well as in Newhouse's capacity to relate to others.  (Tr. 137.)

Finally, on July 23, 2001, Newhouse's treating psychologist, Dawn Lord, Ph.D., completed a questionnaire regarding his mental impairments.  (Tr. 149-150.)  Dr. Lord indicated she examined Newhouse on thirteen occasions between October 21, 1999 and February 24, 2001.  (Tr. 150.)  She described Newhouse's mood and affect as depressed and anxious, and characterized his condition as "moderately severe."  (Tr. 149.)  Newhouse was oriented to person, place, and time, and his flow of conversation and speech were appropriate.  (*Id*.)  Dr. Lord noted his concentration span was short and he lacked insight.  (*Id*.)

Dr. Lord identified a diagnosis of Dysthymic Disorder.  (Tr. 150.)  She found Newhouse could follow directions and was capable of managing benefits.  (*Id.*)  However, she noted he had a short attention span and was tangential and socially isolated "to some extent."  (*Id.*)  Dr. Lord

8

also determined Newhouse would not react well to the pressures, in work settings or elsewhere, involved in simple and routine, or repetitive tasks.  (*Id.*)

## C.    Hearing Testimony

During the May 16, 2015 hearing, Newhouse testified to the following:

- He was not currently working.  (Tr. 185.)  The last time he worked was in 2012, in a part-time capacity.  (*Id.*)

- In 2000, he worked for a motel and then as a shuttle driver.  (Tr. 186.)  He also earned self-employment income performing light cleaning for a car dealership. (*Id.*)  He was "always doing the cleaning" for this particular dealership, including at the time of his April 2001 disability application.  (Tr. 188.)  This cleaning work was all year round and was not seasonal in nature.  (Tr. 187.)

- After his 2001 application was granted, he wrote seven separate letters to SSA. (Tr. 188-189.)  In each, he sent back his Medicare card and explained he did not need medical benefits because his wife had health insurance.  (*Id.*)  Rather, he needed cash disability benefits.  (*Id.*)

In addition, and of particular relevance herein, Newhouse testified as follows:

Q:     So if, in April 2001, when the claims representative at Social Security was asking you questions about your disability and your work history, and they wrote down that you had self-employment cleaning work the year before, in the year 2000 – and again this is in April of '01, they were talking to you — is there any reason you can imagine you would not have told them, yes, I did that work last year but, no, I'm not doing it this year?

A:     I– I don't really understand what you're – you're saying, I'm sorry.

Q:     Is there – is there any chance that, as of April '01, when you were sitting with somebody at the Social Security office, is there any chance that, in April '01, you were not currently doing the cleaning for [the car dealership]?

A:     No, I was always doing the cleaning for [the car dealership].

* * *

Q:     Did you understand that you had a duty to report to Social Security any new work activity, any new earnings over time?

9

A:       Definitely, I understood that.

(Tr. 188-190.)

### III.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      A reopening of the claimant's application for disability benefits dated April 24, 2001 is not appropriate.

2.      The determination granting disability Medicare benefits dated July 24, 2001 became administratively final when the claimant did not appeal the determination within the required time.

3.      The claimant did not waive his right to benefits in his letter dated June 25, 2001.

(Tr. 15-20.)

### IV.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,

10

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

11

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## V.  ANALYSIS

Newhouse argues the ALJ's decision not to reopen his 2001 DIB application "failed to comply with relevant regulations and was not supported by substantial evidence."  (Doc. No. 13 at 11, 14.)  He appears to assert that, at the time of the 2001 application, the Commissioner knew, or should have known, about his updated self-employment income from 2000 and 2001.  (*Id.*) Specifically, Newhouse argues that, at the time of his 2001 application, the Commissioner erred "with respect to Plaintiff's taxed self-employment earnings, meaning the earnings had not yet appeared in Defendant's earning record and Quarters of Coverage report but were imminent; or Defendant erred in failing to take notice that Plaintiff's self-employment earnings, if continuing, may well have insured Plaintiff for benefits very soon." (*Id.* at 14.)  Newhouse further maintains the ALJ erred in finding the Commissioner did not possess his 2001 self-employment income information until 2012. (*Id.* at 17.)  Finally, Newhouse argues the ALJ erred in finding his mental limitations were not so severe as to preclude him from understanding and timely pursuing his appeal rights.  (*Id.* at 17-19.)

The Commissioner argues that, absent a colorable constitutional claim, this Court does not have jurisdiction to review the ALJ's decision not to reopen a prior application.  (Doc. No. 14

at 5.)  She acknowledges a colorable constitutional claim is established where a claimant's

mental capacity prevented him from pursuing his administrative remedies; however, she asserts

Newhouse "has not cited any evidence to support" such a claim.  (*Id*. at 5-6.)  Specifically, the

Commissioner argues Newhouse cites no evidence suggesting he could not understand how to

request further administrative review of his 2001 application.  (*Id.* at 6.)  The Commissioner

asserts Newhouse's other arguments regarding the agency's alleged errors in evaluating his 2001

application do not allege "colorable constitutional claims" and, therefore, are not reviewable in

this Court.  (*Id*.)  Even if they did state such claims, the Commissioner asserts Newhouse "has

identified no error in the ALJ's application of the Commissioner's regulations in this case."  (*Id*.

at 7.)  In this regard, she argues there is no evidence the Agency possessed Newhouse's self-

employment income information at the time of its 2001 determination.  (*Id*.)

Judicial review of Social Security disability claims is governed by 42 U.S.C. § 405(g)

and 42 U.S.C. § 1383(c)(3), which grant a district court subject matter jurisdiction over a final

decision of the Commissioner made after a hearing.  *See Califano v. Sanders*, 430 U.S. 99, 108,

97 S.Ct. 980, 51 L.Ed.2d 192 (1977).  However, "[n]ot all decisions relating to disability benefits

are subject to judicial review."  *Johnson v. Comm'r of Soc. Sec*., 2018 WL 485983 at * 2 (S.D.

Ohio Jan. 19, 2018).  Rather, the Supreme Court has held a federal court's jurisdiction under the

Social Security Act is limited by the terms of the statute to review of a "final decision of the

[Commissioner] made after a hearing."  *Califano*, 430 U.S. at 108.  Because the denial of a

request to reopen a prior final decision may be made without a hearing, the federal courts lack

jurisdiction to review a claim the Commissioner abused his or her discretion in declining to

13

reopen a prior application for benefits.[5]  *Id.*

An exception to this general rule exists, however, in those "rare instances" where the denial of a request to reopen is challenged on constitutional grounds.  *Id.* at 109.  *See also Bogle v.Sullivan,* 998 F.2d 342, 346 (6th Cir. 1993) ("[T]his court has no jurisdiction to review the actions of the Secretary on the earlier claim in the absence of a colorable constitutional claim"); *Anderson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 366, 369 (6th Cir. 2006) ("[O]rdinarily federal courts do not have jurisdiction to review and ALJ's decision not to reopen a prior application. The exception is where a claimant raises a colorable constitutional claim"); *Noell v. Colvin*, 2016 WL 541467 at * 10 (N.D. Ohio Feb. 11, 2016) ("When a prior decision is not reopened, this Court has no jurisdiction to review the actions of the Secretary in the absence of a colorable constitutional claim.")

In *Parker v. Califano*, 644 F.2d 1199, 1203 (6th Cir.1981), the Sixth Circuit found a claimant raised a colorable due process claim where she alleged her mental condition prevented her from timely pursuing her administrative remedies following the denial of her first application for benefits.  The Sixth Circuit explained that due process mandates a claimant receive meaningful notice and an opportunity to be heard before a claim for disability benefits may be denied.  *Id.*  Because "the very disability that forms all or part of the basis for which the claimant seeks benefits may deprive [him] of the ability to understand or act upon notice of available administrative procedures," due process requires the Commissioner to consider whether a

---

[5]  The Supreme Court explained "an interpretation that would allow a claimant judicial review simply by filing and being denied a petition to reopen his claim would frustrate the congressional purpose, plainly evidenced in s 205(g), to impose a 60-day limitation upon judicial review of the Secretary's final decision on the initial claim for benefits."  *Id.* at 108.

claimant's mental capacity inhibited his ability to seek further review.  *Id.*  However, "[i]t is not sufficient for a claimant to allege merely that he suffered from a mental impairment at the time of the earlier decision; he must show that the mental impairment eroded his ability to pursue his claim."  *Grubbs v. Callahan,* 1997 WL 530526 at * 2 (6th Cir. July 8, 1997).  *See also Wills v. Sec'y, Health & Human Svcs*., 802 F.2d 870, 873 (6th Cir. 1986) ("[T]his court has recognized that a case may also be reopened by the Secretary where the claimant's mental condition prevented timely pursuit of his administrative remedies."); *Anderson*, 195 Fed. Appx. at 369 ("In this Circuit, a colorable constitutional claim is established and judicial review is proper where the claimant's mental capacity prevented him or her from pursing administrative remedies").

SSR 91-5p, 1991 WL 208067 (SSA July 1, 1991) provides agency guidance regarding the standard for establishing mental incapacity in this context.  This Ruling explains "[i]t has always been SSA policy that failure to meet the time limits for requesting review is not automatic grounds for dismissing the appeal and that proper consideration will be given to a claimant who presents evidence that mental incapacity may have prevented him or her from understanding the review process."  *Id*. at * 2.  "When a claimant presents evidence that mental incapacity prevented him or her from timely requesting review of an adverse determination . . . , and the claimant had no one legally responsible for prosecuting the claim (e.g., a parent of a claimant who is a minor, legal guardian, attorney, or other legal representative) at the time of the prior administrative action, SSA will determine whether or not good cause exists for extending the time to request review."  *Id*.  SSR 91-5p further provides as follow:

> In determining whether a claimant lacked the mental capacity to understand the procedures for requesting review, the adjudicator must consider the following factors as they existed at the time of the prior administrative action:

15

—inability to read or write;

—lack of facility with the English language;

—limited education;

—any mental or physical condition which limits the claimant's ability to do things for him/herself.

If the claimant is unrepresented and has one of the factors listed above, the adjudicator will assist the claimant in obtaining any relevant evidence.  The decision as to what constitutes mental incapacity must be based on all the pertinent facts in a particular case. The adjudicator will resolve any reasonable doubt in favor of the claimant.

*Id.*

Where a claimant asserts a constitutional claim based on an ALJ's finding the claimant was not mentally incapable of timely pursuing his or her rights, the Court must determine whether the ALJ's determination of that issue is supported by substantial evidence.  *See e.g., Wills*, 802 at F.2d at 873 (finding district court "properly applied the substantial evidence test in reviewing the issues of fact upon which" the ALJ's determination of mental incapacity was based); *Swartz v. Barnhart,* 188 Fed. Appx. 361, 370 (6th Cir. 2006) (noting "the question on appeal is whether the ALJ's finding that Swartz had the [mental] capacity to file a timely appeal is supported by substantial evidence"); *Everman v. Comm'r of Soc. Sec.*, 2016 WL 4942036 at *2 (E.D. Mich. Aug. 22, 2016) (finding "the precise issue before the Court is whether the ALJ's decision that plaintiff failed to establish good cause for missing her deadline based on alleged mental impairments is supported by substantial evidence.")  Absent a finding the claimant has established a colorable constitutional claim under the substantial evidence test, a federal court has no jurisdiction to review the regulatory basis for an ALJ's decision not to reopen a prior application.  *See Wills*, 802 F.2d at 873; *Anderson*, 195 Fed. Appx. at 369.

Here, Newhouse asserts the ALJ misapplied SSR 91-5p and improperly determined that his mental limitations were not so severe as to prevent him from timely pursuing further administrative review of his 2001 DIB application.  Based on the authority set forth above, this argument asserts the existence of a constitutional claim.  *See e.g., Parker*, 644 F.2d at 1203.  Thus, the threshold issue before this Court is whether the ALJ's decision that Newhouse did not establish good cause for failing to timely pursue his administrative remedies due to his alleged mental impairments is supported by substantial evidence.  *See, e.g.*, *Swartz,* 188 Fed. Appx. at 370; *Everman*, 2016 WL 4942036 at *2.

In his June 2015 decision, the ALJ stated " the thrust of the claimant's argument is that his April 24, 2001, application should be reopened, since his newly reported earnings entitled him to cash benefits back to his new date last insured of January 1, 2001."  (Tr. 17.)  The ALJ explained that "in this case, the claimant is requesting reopening pursuant to [20 CFR 404.987](C)(7), which provides for reopening at any time if we find that the claimant did not have insured status, but earnings were later credited to his or her earnings record to . . . correct errors made in the allocation of wages or self-employment income to individuals or periods . . . which would have given him or her insured status at the time of the determination or decision if the earnings had been credited to his or her earnings record at that time, and the evidence of these earnings were in our possession . . . at the time of the determination of decision."  (Tr. 16.)

The ALJ then set forth the regulatory requirements for establishing "good cause" to reopen a determination or decision.  (Tr. 16.)  The ALJ also expressly acknowledged the applicability of SSR 91-5p, noting "[b]ecause the claimant has been found disabled due to a mental impairment, the factors outlined in Social Security Ruling 91-5p are relevant to this

17

determination." (*Id.*)  The ALJ recited the factors to be considered pursuant to SSR 91-5p and stated "the decision as to what constitutes mental incapacity must be based on all the pertinent facts in a particular case." (Tr. 17.)

After recounting the facts and procedural history relating to Newhouse's DIB applications, the ALJ found a reopening of the 2001 application was not appropriate. (*Id.*)  The ALJ determined that, at the time of his 2001 application, Newhouse "provided no substantiation for his reported self-employment, and there is no record as to how much he actually reported earning, only that it was greater than $400 for 2000." (*Id.*)  The ALJ found "there is no evidence or compelling reason to believe that the claimant was misled or otherwise not given sufficient attention when his claim was taken." (Tr. 18.)  Nor did the ALJ find any evidence of error on the part of the claims representative at the time of the application. (*Id.*)  Because the Agency did not have any record of Newhouse's newly reported self-employment income at the time of the 2001 application, the ALJ found "a reopening is against Agency policy." (*Id.*)

The ALJ then addressed the issue of Newhouse's mental impairment, as follows:

In a Title XVI case, it is field office policy to check for new quarters of coverage roughly bi-annually, when the claimant calls or appears for an income and resources review.  If it is found that they are now eligible for Title II cash benefits due to earning more quarters of credit, they are retroactively paid from the date first insured.  This is a similar situation, but no such reviews were undertaken, since the claimant was receiving only Medicare coverage.  At the time the new earnings were recorded, a new Title II application was necessary since the 2001 application was administratively final.  Specifically, the determination became final when the claimant did not appeal in the required time period.  In the award letter dated July 24, 2001, it specifically stated that the "benefit described in this letter [Medicare] is the only one you can receive from Social Security.  If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application." (B3).  Thus, it is the 2012 Title II application that is the controlling date for back pay and benefits, as the claimant was previously found to be ineligible for Title II cash benefits in the prior July 24, 2001, determination.

18

> **[Newhouse's counsel] Mr. Davis argues that his claimant's mental disabilities would have precluded him from timely filing an appeal, and encourages me to analyze the claimant's competence under SSR 91-5p.  He specifically points to item number 4 in the list of factors, which is "any mental or physical condition which limits the claimant's ability to do things for him/herself."  In this case, the claimant undoubtedly had some mental limitations, as this Agency has previously determined.  However, the claimant's treating physician opined in 2001 that the claimant could follow directions, would be capable of managing any benefits due and had adequate orientation (B34/2-3).  The claimant has also been noted to have average intelligence (B33/3).  Thus, there is no evidence that the claimant's mental limitations were so severe as to preclude him from understanding the benefit letter he received and subsequently filing an appeal.**

(Tr. 18-19) (emphasis added).

The Court finds substantial evidence supports the ALJ's determination Newhouse's mental limitations did not prevent him from timely pursuing his administrative remedies.  The ALJ expressly acknowledged Newhouse's mental impairments, as well as the applicability of SSR 91-5p.  The ALJ correctly noted Newhouse's treating psychologist, Dr. Lord, opined in July 2001 that he (1) was oriented to person, place and time; (2) could follow directions; and (3) was capable of managing his benefits.  (Tr. 18-19, 149-150.)  In addition, while Dr. Gajarsky opined Newhouse had significant impairments in concentration, attention, memory and social functioning, she also found he had average intelligence and was "capable of following and understanding instructions."  (Tr. 139-142.)  The record also reflects Newhouse completed the 12th grade and did not attend special education classes.  (Tr. 159.)  Notably, at the administrative hearing in 2015, Newhouse did not testify he did not understand the appeal process relating to his 2001 application as a result of his mental impairments, or that his impairments otherwise inhibited his ability to pursue an appeal of the 2001 determination.  Indeed, Newhouse testified he continued to communicate with the Agency in the years after the 2001 determination, sending letters on approximately seven separate occasions.  (Tr. 188-189.)

19

Newhouse nonetheless argues remand is required because SSR 91-5p applies not only where a claimant's mental incapacity may have prevented him from *understanding* the review process, but also where his or her mental incapacity "limits the claimants ability to do things for him/herself."  (Doc. No. 15 at 2.)  Newhouse maintains he satisfies this standard in light of evidence he has significant impairment in maintaining focus and following through with tasks. (*Id*.)  The Court finds this argument without merit.  While Newhouse's treating physicians opined he had significant limitations in memory, concentration and "following through with daily functioning," they also specifically found he was "capable of *following* and understanding instructions."  (Tr. 141-142) (emphasis added).  In addition, Dr. Lord found Newhouse was capable of managing benefits, if awarded, which would by necessity include the abilities to follow through with tasks and "do things for himself."  (Tr. 150.)

Based on the above, the Court finds Newhouse has not met his burden of demonstrating his mental impairments were such that they prevented him from timely pursuing his administrative remedies relating to the Agency's disposition of his 2001 application.  *See e.g., Everman*, 2016 WL 4942036 at * 5.  While the Court acknowledges there is evidence in the record that might support Newhouse's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at *10 (E.D. Mich. March 1, 2018).  Here, the ALJ's

findings on the issue of Newhouse's mental impairments are within that "zone of choice" and thus supported by substantial evidence.

As noted above, Newhouse also argues the Commissioner erred at the time of his 2001 application by failing to recognize additional self-employment earnings "were imminent" and "if continuing, may well have insured Plaintiff for benefits very soon." (Doc. No. 13 at 14.)  The Court finds this argument does not assert a colorable constitutional claim and, therefore, the Court does not have jurisdiction to consider it.  *See Califano*, 430 U.S. at 108-109; *Bogle*, 998 F.2d at 346; *Anderson*, 195 Fed. Appx. at 369.

Assuming *arguendo* this issue did constitute a "colorable constitutional claim" properly within this Court's jurisdiction, the undersigned recommends the Court find it to be without merit.  As noted above, the ALJ determined reopening was not appropriate under 20 CFR §§ 404.987 and 404.988 because: (1) at the time of his 2001 application, Newhouse provided no substantiation for his reported self-employment, and there is no record as to how much he actually reported earning; (2) in 2001, the Agency did not have any record of Newhouse's newly reported self-employment income; (3) "there is no evidence or compelling reason to believe that the claimant was misled or otherwise not given sufficient attention when his claim was taken;" and (4) "there is no evidence at the time of the application that there was any error on the part of the claims representative." (Tr. 17-18.)  Newhouse does not identify any specific evidence to the contrary.  Indeed, Newhouse acknowledges in his Brief that "the record simply lacks any evidence of what was explained to Plaintiff or whether Plaintiff understood what he was being told." (Doc. No. 13 at 15.)  Moreover, Newhouse expressly testified at the hearing that, in 2001, he understood he "had a duty to report to Social Security any new work activity [and] any new

21

earnings over time."  (Tr. 190.)

Finally, while Newhouse complains the administrative record is incomplete,[6] the Sixth Circuit has stated "we do not believe that the due process clause requires the [Commissioner] to retain records perpetually in order to enable claimants to reopen their cases at any time."  *Gosnell v. Sec'y of Health & Human Servs.*, 703 F.2d 216, 218 (6th Cir. 1983).  *See also Glazer v. Comm'r of Soc. Sec.*, 92 Fed. Appx. 312, 315 (6th Cir. March 18, 2004) ("Glazer has a responsibility for maintaining her own records.  Although she is attempting to blame the Commissioner for the lack of a record in her attempt to reopen her claim under 20 CFR § 404.988(c)(8), it is Glazer's responsibility to show the error.").[7]

Accordingly, and for all the reasons set forth above, the Court finds substantial evidence supports the ALJ's determination Newhouse's mental limitations did not prevent him from timely pursuing his administrative remedies.  The Court further finds the remaining arguments raised in Newhouse's Brief fail to state any colorable constitutional claims and, therefore, this Court is without jurisdiction to consider them.  Finally, even assuming *arguendo* any of Newhouse's remaining arguments did constitute a "colorable constitutional claim" properly within this Court's jurisdiction, the Court find them to be without merit.

---

[6] The Court notes Newhouse does not identify any particular documents he believes are missing from the administrative record.

[7]  Moreover, the Court notes the ALJ attempted to secure "as much information and evidence as possible," including making an "official request to make sure that we've received everything from the field office."  (Tr. 19, 182.)  The ALJ also gave Newhouse's counsel "every opportunity to locate and introduce new evidence, including allowing him to look through our own internal records."  (Tr. 19.)

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge therefore recommends the

Commissioner's final decision be AFFIRMED.


                                              *s/Jonathan D. Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge

Date: May 1, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

23